Filed 8/16/22  P. v. Salas CA2/6
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO SALAS,<br><br>    Defendant and Appellant. | 2d Crim. No. B301365<br>(Super. Ct. No. 2008006111)<br>(Ventura County)<br><br>OPINION ON REMAND |

Alejandro Salas appeals from a postjudgment order granting in part and denying in part his motion for resentencing under Penal Code[1] section 1172.6 (former § 1170.95)[2].  In 2010, a jury convicted Salas of second degree murder (§ 187, subd. (a))

---

[1] All statutory references are to the Penal Code.

[2] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

and three counts of attempted murder (§§ 187, 664). The jury also found true gang and firearm enhancement allegations as to all four counts. (§§ 186.22, subd. (b)(1), 12022.53, subds. (d), (e)(1)). Salas was sentenced to an aggregate term of 128 years and 8 months to life in state prison.

In January 2019, Salas filed a petition for resentencing under section 1172.6. Following an evidentiary hearing, the court found Salas was entitled to relief on his conviction of second degree murder, vacated the true findings on the gang and firearm use allegations as to that count, and redesignated the conviction as a conviction for conspiracy to commit a battery (§ 182, subd. (a)(1)). The court then resentenced Salas to an aggregate term of 75 years to life plus 14 years and four months in state prison.[3]

In appealing, Salas contended the court erred in finding he was ineligible for resentencing as to his convictions for attempted murder. He also contended the court erred in concluding that Senate Bill 620–which amended the law to give trial courts the discretion to strike or dismiss section 12022.53 firearm enhancements in the interests of justice pursuant to section 1385–did not give the court the authority to strike the charged enhancements and instead impose lesser uncharged statutory enhancements. Finally, he claimed the matter must be remanded for resentencing because the court was unaware of its

---

[3] Appellant was convicted of attempted murder on counts 10, 11, and 12. On count 10, the court sentenced him to the upper term of 9 years, plus 25 years to life for the firearm enhancement. On counts 11 and 12, appellant was sentenced to consecutive terms of two years and four months (one-third the midterm) plus 25 years to life for the firearm enhancements. On the redesignated offense of conspiracy to commit a battery, the court imposed a consecutive eight-month prison term.

discretion to impose concurrent rather than consecutive terms on the firearm enhancements imposed under section 12022.53, subdivision (d).

In a January 2021 unpublished decision affirming the judgment, we concluded that (1) relief under section 1172.6 was not available to those convicted of attempted murder rather than murder; (2) the trial court did not have the authority to strike the charged enhancements and instead impose lesser uncharged enhancements; and (3) the court did not have the discretion to imposed concurrent terms on the firearm enhancements. (*People v. Salas* (Jan. 4, 2021, B301365) [nonpub. opn.].) Salas petitioned the California Supreme Court for review on the first two issues. The court granted review on both issues and held the case along with numerous similar cases. While the matter was pending, the Governor signed into law Senate Bill No. 775 (Senate Bill 775), which amended section 1172.6 to expand eligibility for resentencing to persons convicted of attempted murder. (Stats. 2021, ch. 551.) Our Supreme Court also held that in the circumstances presented here, trial courts have the discretion to strike firearm enhancements and impose lesser uncharged statutory enhancements. (*People v. Tirado* (2022) 12 Cal.5th 688, 692 (*Tirado*).)

On May 18, 2022, the California Supreme Court transferred the case back to this court with directions to vacate our prior decision and reconsider the matter in light of Senate Bill 775 and *Tirado*. (*People v. Salas* (May 18, 2022, S266966) [2022 Cal. Lexis 2834].) In supplemental briefing, the People concede that as to the attempted murder convictions the matter must be reversed and remanded for further proceedings under section 1172.6, subdivision (c). The People further concede that

the matter must be remanded for resentencing in accordance with *Tirado*. We shall accordingly reverse and remand for further proceedings.

## STATEMENT OF FACTS

The relevant facts are derived from our 2013 unpublished opinion affirming the convictions of Salas and codefendants Lino Hernandez and Alvino Joe Hernandez. (*People v. Hernandez et al.* (June 24, 2013, B229363 [nonpub. opn.].) "Lino, Alvino and Salas are members of Colonia Chiques (Colonia). Colonia claims a large section of Oxnard as its territory. Lino, Alvino and Salas were known as Veneno, Flaco and Barbs, respectively."

"Oxnard Police Department Sergeant Christopher Williams testified as the primary prosecution gang expert witness at trial. . . . Williams explained that gang members gain respect and power in their gang by committing violent crimes. Gangs honor members who are killed 'for their cause' as 'fallen soldiers.' Colonia was 'one of the most violent' gangs in Ventura County."

"In 2006, Alvino lived with his family in an apartment building at 2011 North Ventura Road in Oxnard (2011 building), north of the traditional Colonia territory. Salas and his family also lived in that building. The murder and attempted murders occurred in the courtyard of another building on the same block, at 2045 Ventura Road, where victim Abraham Lopez lived with his brothers Moises Lopez and Hector Lopez (Lopez building, or Lopez apartment). The 2011 building and the Lopez building are 416 feet apart.

"Abraham and Hector belonged to a tagging group called 'DSK,' which had about 20 members. . . . Moises associated with DSK. Their oldest brother, 29-year-old Octavio Lopez, lived nearby and often visited the Lopez apartment, but he was not a

4

DSK member or associate. [¶] DSK was mainly devoted to 'tagging' property with its graffiti. It also defaced other groups' graffiti. DSK sometimes fought against other tagging groups. Some DSK members owned and carried weapons."

"DSK member Richard Gonzalez grew up in Colonia territory. Colonia members once jumped Gonzales, while he sat on his porch, in retaliation for his tagging in Colonia territory. Colonia members also jumped Moises at McDonald's when he wore a White Sox baseball cap like those worn by Southside Chiques, one of Colonia's rival gangs. Salas, Alvino and other Colonia members drove to the home of DSK Johnny Rocha and stood outside yelling at him. Colonia members also gathered outside the Lopez apartment and yelled at its occupants.

"In 2006, Salas, Alvino, Andy Sanchez (Panda) and other Colonia members regularly congregated at the Lopez building mailbox area. That made Hector feel intimidated when he went to get his mail. DSK and Colonia members crossed out each other's graffiti near the Lopez building.

"On May 5, 2006, Gonzalez went to a party at the Lopez apartment. During the party, two Colonia members, including Panda, jumped DSK member Jose Delgadillo (Ohno) in the alley behind the Lopez building. After Gonzalez said, 'one on one,' Panda fought Ohno, while the other Colonia member fought Gonzales. Ohno knocked out Panda's tooth.

"Sometime later, before September 2006, Colonia and DSK arranged for Panda and Ohno to fistfight again, 'to stop problems.' Alvino and Salas accompanied Panda to the alley behind the Lopez building. Panda and Ohno had just started fighting when two more Colonia members arrived, armed with aluminum baseball bats. Abraham, Moises, Hector and his friend

5

Ralph, and a teenager were there. Abraham or Moises yelled something like, 'I thought this was supposed to be a fistfight. You guys bring weapons.' Alvino held a knife against the teenager and said, 'Well, grab your own bats.' Hector said, 'Let him go.' A Colonia member struck Moises with a bat, which Moises grabbed and held. Ralph picked up a stick. Things ended when Alvino pushed the teenager toward Hector.

"In early August 2006, the ongoing conflict with Colonia led Abraham to acquire a .380-caliber handgun (.380). Gonzalez acquired a .357-caliber handgun (.357). Hector moved to Arizona in August 2006, to avoid the escalating Colonia–DSK conflicts."

"September 4, 2006, was Labor Day and Gonzalez's 21st birthday. He spent the day shopping with Octavio and Moises. Octavio drove them back to the Lopez building in the late afternoon. Salas approached Octavio's car. When Octavio stopped the car, Salas said he wanted to arrange a fistfight between a Colonia member and 'Johnny.' Octavio agreed to help arrange it. Gonzalez, Moises and Octavio went to the Lopez apartment, and drank beer.

"Moises's girlfriend, Michele White, drove to the Lopez building at around 6:30 p.m. on September 4, 2006, to retrieve her game console from Moises. White saw Salas's brother-in-law, Alonzo Hernandez, make a crude gesture at Moises while she was outside with him. Salas, Alvino, and Lino then approached White and Moises. Moises called his brothers to warn them that they were there, and asked them to bring a gun.

"Moises and White entered the courtyard from the alley. Salas, Alvino, and Lino followed and surrounded them. . . . [¶] Octavio, Abraham, Moises, and Gonzalez went downstairs and entered the courtyard. Gonzalez, who was right-handed, carried

6

a beer in his right hand.  He had a gun in his waistband, under his shirt.  Moises told White to go upstairs.  White started to walk toward Ventura Road but turned back after Lino said, 'Where are you going?  It's all right.  Nothing's going to happen.'  White stopped in the northeast section of the courtyard, just north of the central walkway that led to Ventura Road.  The DSK and Colonia members were closer to the alley, at the west end of the courtyard.

"Octavio and Abraham were in the southwest section of the courtyard, facing Lino and Alvino, who were a couple of feet north of them.  Lino and Alvino each hid a gun beneath his sweatshirt.  Octavio wore shorts, a t-shirt, and flip-flops.  Gonzales was a foot or two behind Octavio and Abraham.  Moises had moved to the northwest section of the courtyard, east of Alvino and Lino.

"Addressing Octavio, Lino said, 'My carnal [brother] wants you to keep his name out of your fucking mouth.'  He asked Octavio, 'Who is going to get down [fight]?'  Octavio responded that he was willing to fight, as long as no weapons were used.  Pointing at Lino's sweatshirt (which then covered a semi-automatic TEC-9 "machine gun" with an attached clip), Octavio asked, 'What's that you got there?'  Lino pulled out the TEC-9 and started firing immediately.  Alvino pulled out a nine millimeter Makarov handgun and fired it.  Several shots hit Octavio, and he fell.

"When the shooting started, Gonzalez dropped his beer can and started to run away.  Seven shots hit him, and he fell.  Gonzalez then aimed his .357 toward Lino, fired several times, and tossed it in the bushes.  White was still in the northeast section of the courtyard, when a bullet struck her leg.  She fell and lay still.

"After Lino and Alvino started shooting, several bullets hit Abraham. He fell, loaded his .380, and fired it. While Abraham was down, Alvino pistol-whipped and shot him in the face. Alvino took Abraham's .380 and ran away with Lino.

"Oxnard Police Department Officer Jeffrey McGreevy was working on September 4, 2006. He heard gunshots at approximately 6:50 p.m. and arrived at the Lopez building minutes later. McGreevy found Octavio, Abraham, White, and Gonzalez lying in the courtyard. Octavio was not responsive, and lay face down with blood pooling under his head and chest. There was a beer can near Gonzalez. Moises was also there, trying to help Octavio. When McGreevy asked Abraham, Moises, Gonzalez, and White if they knew who the shooters were, they refused to answer or said they did not know. [Fn. omitted.]

"Police at the crime scene recovered 21 expended casings from a semi-automatic TEC–9 weapon; an expended casing from a nine millimeter Makarov handgun; two expended casings and one misfired bullet from a .380 caliber handgun; and six expended casings from a .357 revolver. They found a .357 near the spot where McGreevy found Gonzalez. [Fn. omitted.]

"Several days later, an officer stopped a car in Oxnard. Alvino and his family were in the car, which contained a Makarov handgun; a TEC–9; a nine millimeter magazine with live rounds; and a TEC–9 magazine. Analyses connected those weapons to evidence from the Lopez courtyard and the shooting victims.

"Octavio died within minutes of receiving four gunshot wounds. Bullets pierced his carotid artery and aorta. The surviving victims required hospitalization and extensive treatment, including surgery. Abraham lost an eye and suffered other wounds in his chest, shoulder, forearm, face, legs, and

8

buttocks.  Two bullets remain in his head.  Gonzalez suffered permanent, disabling nerve damage, lost the ability to move his left foot, and needed a leg brace.  Bullets remain in his right shin.  White suffered a gunshot wound that pierced an artery and left numbness in her left leg.

"Police officers interviewed Lino on September 26, 2006, and Salas on October 4, 2006.  Both men denied that they were in Oxnard at the time of the shootings.  Each man claimed he no longer associated with Colonia.  Salas denied knowing DSK members Abraham, Octavio, Moises, Neil Glass, or their fellow DSK member, Johnny Rocha.  Salas initially denied knowing Alvino and Lino, then said he knew them vaguely.  Lino claimed that he had not handled a TEC–9 in several years.

"Officers recovered Abraham's .380 from a Camarillo home where Lino reportedly lived.  Police again interviewed Lino on February 26, 2007.  When they advised him that the TEC–9 contained his DNA, he did not admit he used it, or offer any explanation.  He did admit he owned the .380 handgun.  Upon learning it had fired casings recovered from the shooting scene, he said he often loaned it to others.  He refused to identify the person who returned the gun to him after Labor Day.  He still denied any involvement in the shooting.

"Officers re-interviewed Salas on January 14, 2008.  He again denied that he was in Oxnard on Labor Day and claimed he did not associate with Colonia.  Elizabeth Aragon, the mother of Anna Hernandez (Salas's girlfriend) initially told officers that Salas was with her family in Bellflower on Labor Day.  She later disclosed that Salas had not been with them, and that Anna had pressured her to provide a false alibi to help Salas."

9

"Alvino testified on his own behalf. He said it is hard for him to 'see even with the glasses' because he has 'keratoconus in [his] left eye and [an] astigmatism in [his] right eye.' He admitted prior robbery and weapon possession convictions. Alvino had belonged to Colonia for many years. He always carried a firearm when he left home, because he anticipated he could encounter a rival at any time, and such encounters can easily erupt into deadly violence.

"Alvino testified about the second Ohno–Panda fistfight. Alvino, Salas, and Panda met Abraham, Moises, Glass, Gonzalez and Ohio in the alley behind the Lopez building. Just after Panda and Ohno started fighting, two more Colonia members arrived; one of them held a baseball bat. After a 'little ruckus' erupted, someone from DSK, possibly Gonzalez, said 'grab a cuete [gun].' Alvino pulled out a knife, grabbed Ohno, and threatened to stab him. Alvino did not see any DSK member with a weapon. Alvino also testified that on another occasion, he saw DSK members and heard gunshots 'a couple minutes later.'

"According to Alvino, on Labor Day, September 4, 2006, he was drinking with Lino, a Colonia member named Herbie, and a Colonia associate named Abel when Salas called him. Salas said there was going to be a fight between a Colonia member and a DSK member, and asked Alvino to provide 'back up.' Alvino assumed Salas would be fighting.

"Approximately 90 minutes after receiving Salas's call, Alvino, Lino, and Abel rode with a man named 'Loc' to a home near Salas's apartment. Alvino was carrying the TEC-9 and the Makarov. Because of recent DSK–Colonia incidents, Alvino anticipated that DSK members would be armed. They met with

10

Salas and Panda for about 20 minutes in an alley. Alvino gave Lino the TEC–9.

"Carrying their weapons, Lino and Alvino started walking toward the Lopez building, followed by Salas and Abel. Alvino and Lino encountered Moises and White in the alley. Lino greeted White. Moises and White moved into the courtyard. Alvino and Lino followed and 'crowded around' them.

"Alvino saw Abraham and Octavio in the courtyard. Gonzalez came downstairs. He was drinking a beer. Lino spoke to Octavio, but Alvino could not hear what they said. Alvino had been 'picking' at his waistband and Octavio asked what was in his waistband. Alvino then 'got scared' when he saw Gonzalez 'reaching toward his hip.' He recalled that during the last Ohno–Panda fistfight, Gonzalez had said, 'grab a cuete [gun].'

"Before Gonzalez or anyone with DSK displayed a firearm, Alvino pulled out his gun, started shooting, and struck Gonzalez once. Alvino's gun then jammed and Lino started shooting. Abraham and Gonzales fired their guns. Alvino saw Abraham lying on the ground, aiming a gun at Lino. Alvino ran to Abraham, pistol-whipped him, and took his .380.

"No bullets hit Alvino or Lino. They ran from the courtyard and Loc immediately drove them to their cousin Terry's house in south Oxnard. Alvino hid the TEC-9 and Makarov under the floorboards of Terry's house. Alvino later retrieved the weapons, with the intention of disposing of them. He threw away his clothing so the police would not find it.

"The defense called several witnesses to describe statements made by prosecution witnesses that were contrary to their trial testimony. Oxnard Police Department Sergeant Terry Burr testified that Gonzalez previously told officers that the

11

Colonia members actually were looking for Rocha on the day of the shooting.  Because Rocha was not then at the Lopez apartment, Gonzalez and his friend went downstairs to confront the Colonia members.  On the day of the shooting, White told Burr she had known Abraham for years, and she had no current relationship with anyone living at the Lopez apartment."

## DISCUSSION

In a supplemental brief, the People concede that a reversal and remand on Salas's section 1172.6 petition is required.  We accept the People's concession.

In 2018, the Legislature enacted Senate Bill No. 1437, which eliminated liability for murder under the natural and probable consequences doctrine.  That doctrine provides that "'[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.'" (*People v. Medina* (2009) 46 Cal.4th 913, 920.)  "'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all.  It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense.'"  (*People v. Chiu* (2014) 59 Cal.4th 155, 164, superseded by statute as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 929.)

Senate Bill 1437 enacted section 1172.6, which "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that

murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Gentile* (2020) 10 Cal.5th 830, 842, superseded by statute as stated in *People v. Birdsall* (2002) 77 Cal.App.5th 859, 864.)

Prior to the enactment of Senate Bill 775, the Courts of Appeal were split on whether Senate Bill 1437 applied to attempted murder. Senate Bill 775 resolved this split of authority by amending Senate Bill 1437 to explicitly afford relief to persons convicted of attempted murder and manslaughter. Senate Bill 775's amendments to section 1172.6 became effective January 1, 2022. Salas's appeal from the denial of his resentencing petition was not final as of that date, so he is entitled to the benefit of the new provisions in section 1172.6. (*People v. Porter* (2022) 73 Cal.App.5th 644; § 1172.6, subd. (g).) Accordingly, we shall remand for the trial court to reconsider whether Salas has stated a prima facie for relief on his attempted murder convictions under section 1172.6, subdivision (c), as amended January 1, 2022. We express no opinion on how the petition should ultimately be resolved.[4]

---

[4] We reject Salas's claim that he is entitled to a remand with directions that the trial court either grant his resentencing petition as to the three attempted murder counts, or issue an order to show cause and set an evidentiary hearing under subdivision (d) of section 1172.6. The court's prior finding that appellant had failed to make a prima facie showing for section 1172.6 relief on his attempted murder convictions, as set forth in subdivision (c), was based on the now-invalid conclusion that

We also accept the People's concession that on remand Salas is entitled to resentencing pursuant to *Tirado*. At his prior resentencing, the court indicated it did not have the discretion to strike the section 12022.53, subdivision (d) enhancements and instead impose lesser uncharged statutory enhancements. *Tirado* holds otherwise, so a remand for resentencing is required. Again, we express no opinion on how the trial court should exercise its discretion in resentencing appellant.[5]

## DISPOSITION

The trial court's order summarily denying Salas's section 1172.6 petition as to this attempted murder convictions is reversed. The matter is remanded for the court to conduct further proceedings in accordance with section 1172.6,

---

attempted murder is categorically excluded from the statute. Moreover, the prior evidentiary hearing was based solely to the murder count and the record of conviction. If on remand the matter proceeds to an evidentiary hearing under subdivision (d), the People will be entitled to present new and additional evidence to meet their burden of proving Salas acted with the requisite malice in committing the attempted murders. Under the circumstances, a remand for further proceedings at the prima facie stage of the proceedings is appropriate.

[5] There is no merit in Salas's claim that if the court chooses to reimpose the section 12022.53, subdivision (d) enhancements at resentencing, it has the authority to order that those enhancements run concurrently rather than consecutively to each other. The court had no such authority because it imposed consecutive terms on the underlying substantive offenses. (*People v. Oates* (2004) 32 Cal.4th 1048, 1066; *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311.)

subdivision (c), and to resentence appellant in accordance with *Tirado*, *supra*, 12 Cal.5th 688.

   NOT TO BE PUBLISHED.

                                                  PERREN, J.[6]

We concur:

   GILBERT, P. J.

   YEGAN, J.

---

[6] Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Derek Malan, Judge
Superior Court County of Ventura

_____

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee, Chung L. Mar, Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.